SM

WO

1
2
3
4
5
6                    **IN THE UNITED STATES DISTRICT COURT**
7                       **FOR THE DISTRICT OF ARIZONA**
8
9    Jonathan Robert Beede,                    No.   CV 21-02087-PHX-JAT (JZB)
10                        Plaintiff,
11   v.                                         **ORDER AND**
12                                              **ORDER TO SHOW CAUSE**
     Pinal County Sheriff Facility, et al.,
13                        Defendants.
14
15
16          Plaintiff Jonathan Robert Beede, who is currently confined in Arizona State Prison
17   Complex (ASPC)-Tucson, Whetstone Unit, brought this civil rights case pursuant to 42
18   U.S.C. § 1983.  (Doc. 19.)  Defendants Valdez and Pinal County move for summary
19   judgment based on failure to exhaust (Doc. 60), and Plaintiff did not file a response.[1]
20   Defendant Wexford joins in the Motion for Summary Judgment.  (Doc. 63.)
21          The Court will deny the Motion for Summary Judgment and order Plaintiff to show
22   cause why Defendant Kelly should not be dismissed for failure to serve and why his claim
23   in Count One should not be dismissed for failure to substitute the proper defendant.
24   **I.     Background**
25          In his Third Amended Complaint, Plaintiff sued Wexford Health Services, Nurse
26   Kelly, Pinal County, and Officer Valdez.  (Doc. 19.)  In Count One, Plaintiff claims that
27   on March 21, 2021, he was booked into the Pinal County Adult Detention Center
28
     _____
            [1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952,
     962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Doc. 68.)

(PCADC), and during intake, he informed medical staff that he had a painful, pus-filled lump on his penis.  (*Id.* at 3.)  Plaintiff alleges medical staff refused to do anything about it and that, "per policy they [didn't] have to treat [him] because [he was] in intake."  (*Id.*)  Plaintiff claims that the lump ruptured, and he began to experience chills, cold sweats, swelling, and difficulty urinating.  (*Id.*)  Plaintiff claims he informed numerous medical staff, but they continued to refuse to do anything.  (*Id.*)  After leaving intake, Plaintiff submitted numerous medical requests, was seen by a doctor, and was then sent to the hospital for emergency surgery.  (*Id.*)  The surgeon told Plaintiff, "he couldn't believe they let it get so bad and that surgery wouldn't have been necessary if they had treated it when it was just a lump."  (*Id.* at 3–4.)  After returning to the jail, Plaintiff received wound care for 30 days and was given ibuprofen for two weeks.  (*Id.* at 4.)  Plaintiff alleges he was denied any further pain relief even though he constantly complained of pain.  (*Id.*)  Plaintiff claims he continues to experience problems, including pain.  (*Id.*)  Plaintiff alleges Defendant Wexford Health Services "has the policy, custom or accepted practice of not treating intake inmates' medical issues" and of "not prescribing adequate pain medication."  (*Id.* at 4–5.)  Plaintiff asserts Defendant Kelly was "shown [Plaintiff's] injury before it ruptured and after it ruptured, but she refused to treat [him]."  (*Id.* at 5.)  Plaintiff claims Defendant Kelly was aware of his injury and aware of his pain, "but made the conscious decision not to treat the injury or the pain [Plaintiff] was in," resulting in Plaintiff's suffering.  (*Id.*)

In Count Two, Plaintiff alleges that Defendant Valdez denied his numerous requests for § 1983 civil rights complaint forms and grievance forms, and Defendant Valdez told Plaintiff she "would not help [Plaintiff] sue them and accused [Plaintiff] of lying and trying to pull a scam."  (*Id.* at 7, 8.)  When Plaintiff asked for grievance forms, Valdez told him "no one would give [him] one because [he] was trying to sue them and that while she worked there, if [Plaintiff] somehow managed to submit a grievance or had any forms sent in, she would make sure [he] went to confinement for the rest of [his] stay."  (*Id.* at 7.)  Plaintiff claims that, "[a]ny time [he] asked other officers for grievance or legal forms, they

said that they were told not to give them to [him]."  (*Id.*)  Plaintiff also claims his incoming legal mail was intercepted and kept from him in retaliation for his efforts to file a lawsuit, and that this continued for more than eight months.  (*Id.*)  Plaintiff alleges that Defendant Pinal County "has the policy, custom or accepted practice of allowing their officers at the Pinal County Jail to conduct retaliation and take adverse actions that serve no penological interest."  (*Id.* at 8.)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a Fourteenth Amendment medical care claim in Count One against Defendants Wexford and Kelly and a First Amendment retaliation claim in Count Two against Defendants Pinal County and Valdez and directed them to answer.  (Doc. 20.)

On September 26, 2022, the United States Marshal Service concurrently filed three proofs of service, stating that service had been executed on Defendants Pinal County (Doc. 21), Wexford (Doc. 22), and Valdez (Doc. 23).  Service was returned unexecuted as to Defendant Kelly. (Doc. 24.)  To date, Defendant Kelly has not been served.

Defendants Pinal County and Valdez now move for summary judgment and argue that Plaintiff failed to exhaust the available administrative remedy.  (Doc. 60.)  Defendant Wexford joins in the Motion for Summary Judgment.  (Doc. 63.)  Because Plaintiff did not file a response or controverting statement of facts, the Court will consider Defendants' facts undisputed unless they are clearly controverted by Plaintiff's first-hand allegations in the verified Third Amended Complaint or other evidence in the record.  Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion.  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying

those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.   Exhaustion**

**A.   Legal Standard**

Under the Prison Litigation Reform Act, a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523

(2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

If summary judgment is denied, disputed factual questions relevant to exhaustion should be decided by the judge; a plaintiff is not entitled to a jury trial on the issue of exhaustion. *Albino*, 747 F.3d at 1170-71. But if a court finds that the prisoner exhausted administrative remedies, that administrative remedies were not available, or that the failure to exhaust administrative remedies should be excused, the case proceeds to the merits. *Id.* at 1171.

### B.   Relevant Facts

#### 1.   PCADC Policy 4.3

PCADC Policy 4.3, titled "Inmate Grievance," sets forth the procedure by which PCADC inmates are to file complaints pertaining to issues regarding their conditions of confinement. (Defs.' Statement of Facts, Doc. 61 ¶ 2.) Policy 4.3 provides inmates with an opportunity for informal resolution and formal review of issues impacting conditions of confinement or institutional life. (*Id.* ¶ 3.) All inmates, including Plaintiff, are advised of the grievance process through means, including but not limited to, inmate publications, orientation programs, and inmate bulletin boards. (*Id.* ¶ 9.) During orientation, all inmates

receive an Inmate Handbook to keep on their person.  (*Id.* ¶ 11.)  The Inmate Handbook is available in English and Spanish and includes information pertaining to the inmate grievance process.  (*Id.*)  On March 31, 2021, Plaintiff was provided with, and acknowledged receipt of, a personal copy of the Inmate Handbook. (*Id.* ¶ 13.)  Information and instructions concerning the grievance process are also viewable via Encartele Units, which are in every pod; Encartele Units are digital bulletin boards that display information. (*Id.* ¶ 14.)

If inmates have questions regarding the grievance process, they can ask an officer. (*Id.* ¶ 15.)  Officers are stationed in the inmate pods 24/7.  (*Id.*)  If the officer cannot answer the inmate's questions, the officer will direct the inmate to place an Inmate Request Form in the grievance box located in the pod, which is always accessible to inmates.  (*Id.*)  Upon receipt, the Unit Sergeant will review the Inmate Request Form and provide a response within 24 hours.  (*Id.*)  Inmates may also request assistance from Supervisory Staff who conduct daily rounds during each shift, including the Grievance Coordinator.  (*Id.*)  The Grievance Coordinator regularly conducts rounds in the pods and assists inmates with grievances and grievance-related inquiries.  (*Id.*)

Grievance boxes are located in every pod.  (*Id.* ¶ 19.)  Inmates in general population may deposit grievances into the box themselves or request that a staff member assigned to the pod deposit the grievance for them.  (*Id.*)  After the Grievance Coordinator provides the inmate with a grievance form, the Grievance Coordinator physically indicates to the inmate where the grievance box is located and verbally advises the inmate of the time deadlines as outlined in Policy 4.3.  (*Id.*)

Not all PCADC staff members are permitted to assist inmates with the grievance process.  (*Id.* ¶ 21.)  Facility paralegals, including Defendant Valdez, and others who hold civilian positions ("Civilian Staff") do not service or assist inmates with detention issues, including the inmate grievance process.  (*Id.*)  Civilian Staff do not have access to the grievance process or the forms required to initiate or complete it.  (*Id.*)  Civilian Staff are not readily accessible to inmates, as their offices are not located within the pods.  (*Id.* ¶ 22.)

Civilian Staff usually do not have reason to enter the pods, unless they are addressing a specific inmate issue that is within their purview. (*Id.*) If a civilian staff member, such as a Paralegal, enters the pod, then the Paralegal is escorted by the Unit Officer. (*Id.*)

If an Inmate Request Form pertains to an issue under the purview of Civilian Staff, the custody staff member who received the Inmate Request Form provides it to the Civilian Staff Member for a response. (*Id.* ¶ 23.) Thus, if an inmate submits an Inmate Request Form regarding paralegal services, a custody staff member will provide it to Defendant Paralegal Valdez for resolution before returning it to the inmate. (*Id.*)

### 2.    Grievance Procedure for Non-Medical Complaints

Inmates are encouraged to resolve their complaint at the lowest staff level, to include but not limited to, discussion with staff, submission of an Inmate Request Form, and/or any other means of communication, within five calendar days from the date of the incident. (*Id.* ¶ 29.) Policy 4.3 does not require an inmate to utilize this level of informal resolution. (*Id.* at 5, n.2.) Instead, an inmate may immediately initiate the grievance process by submitting an Inmate Informal Resolution Form 4.3B, in which case, the inmate must submit the form within five calendar days from the date of the incident. (*Id.*) An inmate may obtain Informal Resolution Form 4.3B after speaking with their Shift Sergeant. (*Id.*) The complaint is forwarded or relayed to the Shift Sergeant, who takes the Inmate Informal Resolution Form 4.3B to verbally interview the inmate in an attempt to resolve the matter at that time. (*Id.* ¶ 30.)

If the issue cannot be resolved informally, the inmate may proceed with Inmate Informal Resolution Form 4.3B. (*Id.* ¶ 31.) The Inmate Informal Resolution Form 4.3B is forwarded to the Shift Lieutenant to be addressed within five working days. (*Id.* ¶ 32.) The Shift Lieutenant will review the pertinent information and will interview the inmate. (*Id.* ¶ 33.) If the matter remains unresolved, the Shift Lieutenant will forward the original document, along with any other pertinent information included in their investigation, to the Grievance Coordinator. (*Id.* ¶ 34.) The Grievance Coordinator will then take Formal Grievance Form 4.3A to the inmate. (*Id.*)

The inmate must complete and file Formal Grievance Form 4.3A to include witnesses, the date of the incident, and any other information pertaining to the subject of the grievance, including the inmate's proposed resolution, within three calendar days after rejection of the Informal Resolution response. (*Id.* ¶ 35.) The Grievance Coordinator shall then process the Formal Grievance and provide a response to the inmate within five working days. The Grievance Coordinator or Shift Lieutenant will conduct an investigation and then speak to the inmate in an attempt to resolve the issue. (*Id.* ¶ 37.) The response must include the findings of fact, conclusion, and action taken. (*Id.* ¶ 36.)

If the inmate is not satisfied with the Grievance Coordinator's response, the inmate may file a First Appeal to Command Staff by utilizing the Inmate Grievance Appeal Form 4.3C, which the Grievance Coordinator will provide to the inmate. (*Id.* ¶ 38.) The Inmate Grievance Appeal Form features two levels for appeals; thus, the inmate utilizes this form twice if the inmate chooses to appeal his issue through both the first and second appeal levels. (*Id.* ¶ 39.) Within three calendar days of rejecting the Grievance Coordinator's response to the Formal Grievance, the inmate must state his or her reason for appeal on the Inmate Grievance Appeal Form 4.3C; the Grievance Coordinator will then assign the Appeal to Command Staff, which is typically a Captain. (*Id.* ¶ 40.) Within ten working days, Command Staff will then investigate the alleged violation, will review all forms and applicable investigation materials, and provide a response/resolution; the response must include findings of fact, conclusion, and action taken. (*Id.* ¶ 41.)

If the inmate is dissatisfied with the Command Staff's response, the inmate may submit a second-level appeal to the Deputy Chief on the Inmate Grievance Appeal Form 4.3C. (*Id.* ¶ 42.) Within three calendar days of receiving the Command Staff's response, the inmate must submit the Grievance Appeal Form, and state the reason for the appeal; the Grievance Coordinator will then assign it to the Deputy Chief. (*Id.* ¶ 43.) The Deputy Chief must then provide a response within ten working days. (*Id.* ¶ 44.) The final determination of the Deputy Chief is final. (*Id.* ¶ 45.)

. . .

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.    Grievance Process for Medical Complaints

In addition to the regular grievance process, inmates have access to the medical and emergency grievance processes.  (*Id.* ¶ 46.)   Inmates with a medical complaint are encouraged to resolve their complaint at the lowest staff level, to include but not limited to, discussion with staff, submission of an inmate request form, and/or any other means of communication. (*Id.* ¶ 48.)  If the inmate is unable to resolve their complaint at the lowest level, he/she may file an inmate complaint using Informal Resolution Form 4.3B.  (*Id.* ¶ 49.)  The inmate must file the complaint using Informal Resolution Form 4.3B within five calendar days of the incident; the Informal Resolution Form 4.3B is assigned by the medical assigner within 72 hours to the appropriate staff for informal resolution.  (*Id.* ¶ 50.) The staff member then has five working days to provide an Informal Resolution to the inmate; the inmate may accept the resolution or be allowed to proceed to the Formal Grievance Process.  (*Id.* ¶ 51.)

If the inmate is unsatisfied with the informal resolution, the inmate may complete the Formal Grievance Form 4.3A to include witnesses, date of incident and any other information pertaining to the grievance subject, including plan of action, within five calendar days after non-acceptance of the Informal Resolution.  (*Id.* ¶ 52.)  The Medical Grievance Processer shall then process the Formal Grievance and provide response within five working days, the response shall include the findings of fact, conclusion and action taken.  (*Id.* ¶ 53.)

If the inmate is dissatisfied with the Medical Grievance Processer's response, he may file a First Appeal to Nursing Supervisor or Quality Assurance using the Inmate Grievance Appeal Form 4.3C.  (*Id.* ¶ 54.)  The inmate shall state the reason for appeal on the Inmate Grievance Appeal Form 4.3C within three calendar days; the Medical Grievance Processer shall assign the appeal to Nursing Supervisor or Quality Assurance.  (*Id.* ¶ 55.) The Nursing Supervisor or Quality Assurance shall investigate the violation and provide response/resolution within ten working days; the response shall include the findings of fact, conclusion and action taken.  (*Id.* ¶ 56.)

If the inmate is not satisfied with the response from the Nursing Supervisor or Quality Assurance, he/she may utilize a second appeal to the Director of Health Services or designee.  (*Id.* ¶ 57.)  The inmate shall state the reason for appeal on the Inmate Grievance Appeal Form 4.3C in the second-level Appeal section within three calendar days; the Medical Grievance Assigner shall assign the appeal to Director of Health Services or designee.  (*Id.* ¶ 58.)  The Director of Health Services or designee shall provide response within ten working days.  (*Id.* ¶ 59.)  The final determination of the Director of Health Services or designee will be considered final.  (*Id.* ¶ 60.)

### 4.    Emergency Grievances

Emergency grievances shall be filed with the Shift Supervisor when, if processed through the normal grievance timeframe would subject the inmate to substantial risk of medical harm, personal injury, or will otherwise place the inmate at risk.  (*Id.* ¶ 61.)  The Shift Supervisor shall take immediate action and remove the inmate from the situation that may threaten his/her safety.  (*Id.* ¶ 62.)  If the complaint is medical in nature, the Nursing Supervisor shall evaluate the need for immediate action.  (*Id.* ¶ 63.)  If the complaint is resolved at the lowest level through the Shift Supervisor, the Shift Supervisor shall prepare a report for the Deputy Chief or designee, describing the issue and actions taken to resolve. (*Id.* ¶ 64.)  If the complaint is not considered an emergency, the complaint is returned to the Grievance Coordinator for processing as an informal grievance and the inmate is instructed on actions that they are required to complete.  (*Id.* ¶ 65.)

### C.    Plaintiff's Relevant Grievance History

Plaintiff was incarcerated at PCADC from March 31, 2021 through December 7, 2021.  (Doc. 61 ¶ 1.)  PCADC Grievance Coordinator Sergeant C. Villarruel avers that Plaintiff "failed to submit any grievances regarding either of his claims against Pinal County and Paralegal Valdez" and that Plaintiff "did not utilize the emergency or medical grievance processes."  (Villarruel Decl., Doc. 61-1 ¶¶ 73, 74.)

Defendant Valdez asserts that she "do[es] not have access to grievance forms and cannot provide the forms to inmates."  (Valdez Decl., Doc. 61-2 ¶ 14.)  Defendant Valdez

also asserts that she "do[es] not have authority to direct officers to not process inmate grievance forms[,]" that "[a]t no time . . did [Plaintiff] request a grievance form from [her] either in writing or verbally[,]" and that "[a]t no time during [Plaintiff's] detention at PCADC did [Plaintiff] provide [her] with a grievance form for submission."  (*Id.* ¶¶ 16, 17, 24.)   Defendant Valdez denies threatening to retaliate against Plaintiff for filing grievances and denies telling other officers not to provide Plaintiff with grievance forms. (*Id.* ¶¶ 18, 19, 22, 25.)  Defendant Valdez asserts that:

> In August 2021, I, and several custody staff members (including Grievance Coordinator Villarruel), met with [Plaintiff] to address his mistaken understanding of my role as a paralegal and to clarify the items I could and could not provide to him. . . . The discussion was informal.  [Plaintiff] was not threatened with placement in restrictive housing for submitting grievance forms or otherwise.  Further, at no point during the informal discussion did [Plaintiff] request a form to start the grievance process, despite having the opportunity to do so through Grievance Coordinator Villarruel.

(*Id.* ¶¶ 21–22.)

Plaintiff asserts that when he "asked for grievance forms, Officer Valdez told [him] that no one would give [him] one because [he] was trying to sue them and that while she worked there, if [Plaintiff] somehow managed to submit a grievance or had any forms sent in, she would make sure [Plaintiff] went to confinement for the rest of [his] stay."  (Doc. 19 at 6.)  Plaintiff also asserts that "[a]ny time [he] asked other officers for grievance or legal forms, they said that they were told not to give them to [him]."  (*Id.*)  Plaintiff states that he "was blocked from being able to get grievance forms for 8 months."  (*Id.* at 3.)  In his responses to Defendant Valdez's interrogatories and requests for admissions, Plaintiff indicated that the grievance process was not available to him because "the officers would tell [him] that what [he] was trying to grieve (medical) was not a grievable issue.  Then [he was] told that it was too late to submit a grievance."  (Doc. 61-3 at 27.)[2]  Plaintiff also

---

[2] Defendants argue that Plaintiff's responses to Defendants' requests for admissions were due on January 3, 2023, but Plaintiff did not provide responses until January 17, 2023,

stated that he "submitted multiple requests so as to start the grievance procedure[, but] none were returned to [him] and [he] was berated in person for submitting said requests."  (*Id.*)  Plaintiff also stated that Defendant Valdez "threatened [him] with confinement if [he] kept requesting forms."  (*Id.*)  Plaintiff asserts that:

> I requested Grievance forms and assistance with Civil Complaint forms from Officer Valdez each time I saw her come into my housing unit at first and submitted requests for forms.  She informed me on multiple occasions that she would not give me the forms or assist me because she would never help me sue them.  After a few of these responses, she started threatening me with confinement if I kept asking for forms and Grievances.  I stopped asking her because I was in fear of going to confinement.  I tried to ask other officers who worked my housing unit, but was told by said officers that [Defendant] Valdez told them not to give me any form.  I am unclear to the exact dates, but it was multiple times in April, May, and June of 2021.  One day in August of 2021, I was pulled out of my housing unit into a meeting with Officer Valdez, Lt. Williams, Lt. Cannon, and Sgt. Villar[r]uel.  I was brow-beaten and told that I needed to stop asking for forms and Grievances or I'd get thrown into confinement and forgotten.  I had already stopped, but I didn't ask anymore because I still did not want to go to confinement.

(*Id.* at 29.)

### D.   Discussion

Assuming, arguendo, that Defendants presented sufficient evidence to show that PCADC had an established grievance process, there nonetheless remains a question of fact whether that process was available to Plaintiff in light of the specific circumstances.

Exhaustion is not required when circumstances render administrative remedies "effectively unavailable."  *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010).  A prisoner is excused from the exhaustion requirement where he does not have access to the necessary grievance forms.  *See Marella v. Terhune*, 568 F.3d 1024, 1027–28 (9th Cir. 2009) (per curiam) (finding that the district court erred in concluding that there were no

and therefore, the requests for admissions should be deemed admitted.  (Doc. 60 at 11.)

exceptions to the timely filing requirement because there were no factual findings as to whether the prisoner had access to the necessary forms); *see Albino*, 747 F.3d at 1173 (noting that a remedy may be unavailable if the prisoner "did not have access to the necessary grievance forms within the prison's time limits for filing a grievance"); *see also McBride v. Lopez*, 807 F.3d 982, 984 (9th Cir. 2015) (noting that the exhaustion requirement may be excused where intervening actions or conduct by prison officials render the grievance procedure unavailable). The Ninth Circuit has also recognized that threats of retaliation can render a grievance process effectively unavailable and thereby excuse a prisoner's failure to exhaust. *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015). To make this showing, however, the prisoner must "provide a basis for the court to find that he actually believed prison officials would retaliate against him if he filed a grievance," and he must "demonstrate that his belief was objectively reasonable." *Id.*

On this record, there is a question fact as to whether grievance forms were available for Plaintiff's complaints while he was confined at PCADC and whether he was threatened with retaliation for attempting to access grievance forms. Construing the facts in Plaintiff's favor, Plaintiff was confined at PCADC from March 31, 2021 through December 7, 2021, and he asserts that during the entirety of that approximately 8-month period, he made multiple requests for grievance forms, and his requests were denied every time. Plaintiff asserts that when he asked staff for grievance documents, they told him that his medical issues were not grievable, that they had been told not to give him grievance forms, and that it was too late for him to file a grievance; and when Plaintiff continued to ask for grievance forms, he was berated and threatened with disciplinary confinement if he did not stop asking for grievance forms. It is undisputed that in August 2021, Defendant Valdez and other staff, including Grievance Coordinator Villaruel met with Plaintiff to discuss the various legal and grievance forms available at PCADC. Plaintiff asserts that during this meeting, Defendant Valdez and the other staff members browbeat him and threatened him with disciplinary action if he did not stop asking for grievance forms. Defendant Valdez denies this and asserts that she and the other staff members, merely clarified the items that

she, as a paralegal, could and could not provide to Plaintiff.  Notwithstanding, it is undisputed that grievance forms were not provided to Plaintiff during this meeting, even though, according to Defendants' own evidence, Grievance Coordinators provide grievance forms to inmates.  Yet, inexplicably, no forms were provided to Plaintiff during the August 2021 meeting with the Grievance Coordinator, even though Plaintiff's requests for forms are what led to the meeting, and the apparent purpose of the meeting was to clarify Plaintiff's purported confusion about where to obtain grievance and legal forms.

On this record, Defendants have failed to prove that administrative remedies were available to Plaintiff and capable of use while he was confined at PCADC.  *See Brown*, 422 F.3d at 936-37.  Because there are remaining factual questions as to whether the grievance process was available to Plaintiff during the relevant time, Defendants' motion for summary judgment will be denied without prejudice.  Moreover, because the exhaustion issue is so intertwined with Plaintiff's retaliation claim in Count Two, many of the arguments concerning exhaustion are, presumably, the same as would be presented on a summary judgment motion on the merits of the retaliation claim.  The Court granted a stay on "merits discovery" pending resolution of the instant motion. (Doc. 67.)  Thus, even though exhaustion is intertwined with the merits of Count Two, discovery has been limited, and it is not proper to effectively address the merits of a claim on a motion for summary judgment on exhaustion, where the evidentiary record is limited.  Accordingly, the Court will allow Defendants to re-raise the issue of exhaustion when they move for summary judgment on the merits with the benefit of a fully developed record.[3]

## IV.    Order to Show Cause Regarding Defendant Kelly

Under Federal Rule of Civil Procedure 4(m), if a summons and complaint are not served upon a defendant within 90 days after filing, the court shall, after notice to the plaintiff, either dismiss the action or, if the plaintiff shows good cause for the failure, direct that service be effected within a specified time.  *See Walker v. Sumner*, 14 F.3d 1415,

---

[3] An Order lifting the stay entered on April 17, 2023 (*see* Doc. 67) and setting new pre-trial deadlines is forthcoming.

1421–22 (9th Cir. 1994).

On September 26, 2022, service of Defendant Kelly was returned unexecuted. (Doc. 24.)  In the remarks section of the returned notice, the Marshal noted that "[t]here is not a Nurse Kelly that works for Wexford Health Services per Amy Galpin – Wexford Health Services assistant."  (*Id.*)  In a November 15, 2022 Order, the Court directed Defendant Wexford to provide the name and current working address of the intake nurse who worked on March 31, 2021 during Plaintiff's intake into PCADC.  (Doc. 37 at 3.)  The Court gave Plaintiff leave to file a motion to substitute the proper defendant.  (*Id.*)  On December 14, 2022, in response to the Court's Order, Defendant Wexford indicated that it had disclosed the name of the intake nurse, Dawn Tuttle, to Plaintiff in its Initial Disclosure Statement dated November 11, 2022 (Doc. 36).  (Doc. 42.)  Defendant Wexford attached a Waiver of Service on behalf of Ms. Tuttle.  (Doc. 42 at 4.)  To date, Plaintiff has not served Defendant Kelly or filed a notice of substitution for Ms. Tuttle.

In accordance with the notice requirement in Rule 4(m), Plaintiff will be provided 30 days from the date of this Order to show cause why Defendant Kelly should not be dismissed for failure to serve and why his medical claim in Count One should not be dismissed for failure to substitute the proper defendant.  Failure to respond to this Order to Show Cause may result in Defendant Kelly and/or Count One being dismissed from the action.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 60).

(2)     Defendants' Motion for Summary Judgment (Doc. 60) is **denied**.

. . .

. . .

. . .

. . .

. . .

1      (3)     **Within 30 days** of the date this Order is issued, Plaintiff must **show cause**,

2   in writing, why Defendant Kelly should not be dismissed for failure to serve and why his

3   claim in Count One should not be dismissed for failure to substitute the proper defendant.

4         Dated this 22nd day of May, 2023.

_____
James A. Teilborg
Senior United States District Judge